# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CANDI LYNN MINTERT,<br><br>    Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | )<br>)<br>)<br>)<br>) Case No. 17-cv-525-JPG-CJP<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM & ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Candi Lynn Mintert, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Mintert applied for disability benefits in September 2013, alleging disability as of March 6, 2013. After holding an evidentiary hearing, ALJ Mathias D. Onderak denied the application on January 27, 2016. (Tr. 12-24.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Plaintiff's Arguments

Plaintiff makes the following arguments:

1.  The ALJ failed to include additional limitations in the use of plaintiff's left arm and hand even though two state agency consultants found those limitations.

2.  The ALJ failed to evaluate medical evidence concerning plaintiff's treatment for lung cancer, depression, and anxiety.

3. The ALJ failed to properly evaluate the testimony of plaintiff's husband regarding her depression and anxiety, and relied on outdated opinions of two state agency consultants regarding her mental impairments.

4. The ALJ misinterpreted the medical evidence regarding plaintiff's brachial plexopathy.[1]

5. Plaintiff was not represented at the hearing, and the ALJ failed to fully develop the record.

## **Legal Standards**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649

---

[1] "Brachial plexopathy is a form of peripheral neuropathy. It occurs when there is damage to the brachial plexus. This is an area on each side of the neck where nerve roots from the spinal cord split into each arm's nerves. Damage to these nerves results in pain, decreased movement, or decreased sensation in the arm and shoulder." https://medlineplus.gov/ency/article/001418.htm, visited on February 22, 2018.

F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes", then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Onderak followed the five-step analytical framework described above. He determined that Ms. Mintert had not worked at the level of substantial gainful activity since the alleged onset date and she was insured for DIB through December 31, 2017. He found that plaintiff had severe impairments of lung cancer in remission, status post removal of a tumor and a part of her upper left lobe and resection of ribs 2, 3, 4 and 5 with placement of a left rib plate; COPD; left shoulder and upper extremity impairment; and degenerative disc disease of the cervical spine. He also found that her mental impairments of adjustment disorder, depression, and anxiety were not severe.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level with a number of physical limitations, including a limitation to only occasional fingering, handling, and feeling with her left upper extremity (hand) and no overhead reaching with her left upper extremity (arm). Based on the testimony of a vocational expert, the ALJ concluded that plaintiff could not do her past work, but she was not disabled because she was able to do other jobs which exist in significant numbers in the national and regional economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1965 and was 47 years old on the alleged date of onset. (Tr. 189.) She said she was disabled because of lung cancer; nerve damage in her left arm; fatigue;

depression; loss of mobility, strength, stability, endurance and concentration; and emphysema with shortness of breath. She had a tenth grade education and had worked as a dryer operator in a printing factory, a laundry worker, a machine assistant, a production worker in a flour factory, and a stocker in a grocery store. (Tr. 193-194.)

In May 2014, plaintiff reported that she had developed a frozen shoulder and neck pain. Her depression had worsened and she had begun having anxiety attacks. Dr. Sean Flynn had prescribed medication for anxiety and depression. (Tr. 256-257.)

In June 2014, plaintiff reported that she had constant pain in her neck, left arm, chest, breast and shoulder blade. Her pain began after surgery in April 2013. She was taking Oxycodone and Gabapentin, which did not relieve all of her pain. The medications made her feel tired and spacey. She was not able to do much because of her pain. She had a burning feeling in her left arm. Her left armpit felt like it had needles sticking in it. (Tr. 286-289.)

### 2. Evidentiary Hearing

Plaintiff was not represented by an attorney at the evidentiary hearing in November 2015. (Tr. 34.)

Plaintiff testified that she was unable to work because she could not sit or stand for a long time. She was in pain all the time. She had pain in her left arm. The pain began after her surgery. She was diagnosed with lung cancer in 2013. Part of her left lung and four ribs were removed. She had nerve damage from the surgery. (Tr. 52-54.) She had anxiety and depression since she was diagnosed with cancer, but they had gotten worse. She was taking Lexapro. (Tr. 59.)

Plaintiff was unable to lift her left arm over her head. She could raise it to chest height.

She also said she had trouble "putting it all the way out." The ALJ asked her if she had any other limitations in using her left arm or hand. She said, "My left hand and arm like pulling." (Tr. 71-73.)

Plaintiff's husband testified that plaintiff could not work because she was in pain all the time, did not sleep well, and was depressed. Her left arm was weak and had limited movement. She could not "reach up for things." A lot of her depression started after she was finished with chemotherapy. (Tr. 75-77.)

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work, but she could do other jobs such as usher, office helper, and sales attendant. (Tr. 80-83.)

### 3. Medical Records

A large mass was detected in the upper lobe of plaintiff's left lung on x-ray in March 2013. (Tr. 410.) She was diagnosed with nonsmall cell cancer with chest wall invasion. The left upper lobe was surgically removed in April 2013. During the surgery, the second, third, fourth and fifth ribs were resected, and the fourth and fifth ribs were reconstructed with a titanium plate. (Tr. 447-449.)

In addition to the cancer, a chest CT scan showed severe emphysematous changes in her lungs with scarring in the left lower lobe and emphysematous bullae in the upper lobes. (Tr. 336.)

Following surgery, plaintiff was treated by Dr. Hanna Saba at the Crossroads Cancer Center. In May 2013, Dr. Saba noted that she had a brachial plexus injury following the surgery and had motion and sensory problems with her left arm. Dr. Saba noted that she was at a high risk

for recurrence of cancer and counselled her regarding a clinical trial that randomized patients to different types of chemotherapy plus/minus Avastin. (Tr. 500-501.) About two weeks later, plaintiff was still undecided about the clinical trial. Dr. Saba recommended that she begin chemotherapy in a couple of weeks. The doctor noted "a little anxiety, moderate depression and labile mood." (Tr. 493-494.)

Plaintiff began chemotherapy in June 2013. She elected to participate in the clinical trial, and was assigned to the group that received chemotherapy plus Avastin. (Tr. 478.) She finished her "main treatment" chemotherapy in August 2013. Dr. Saba noted that she was doing well with no significant complications. Dr. Crabtree, the surgeon, had repeated a CT scan and there was no sign of recurrent cancer. She was to continue receiving Avastin for a year from the beginning of chemotherapy. Her brachial plexopathy was better and she was gaining function of the left arm "slowly but steadily." Dr. Saba again noted anxiety, depression and labile mood. (Tr. 627-628.)

Plaintiff continued to receive Avistan for a full year after the beginning of chemotherapy. This was administered once every three weeks at the Crossroads Cancer Center. (Tr. 624-625.)

The records of the Crossroads Cancer Center are located at Tr. 341-415, 457-508, 592-679, and 813-856. During the year of chemotherapy, plaintiff complained repeatedly of persistent nausea and occasional vomiting. (*See, e.g.*, Tr. 635, 633 (noting almost resolved grade 2 toxicity from chemotherapy), 631 (administered two additional days of steroids to prevent severe nausea and vomiting like last time); 624, 621, 842, 838, 835.) She also complained of fatigue. (*See, e.g.*, Tr. 635, 631, 629, 627, 624, 842, 838, 835, 833.)

In August 2013, Dr. Crabtree noted that that she was undergoing chemotherapy and was having "significant fatigue." She was doing physical therapy for her left arm and was at the point

where she could grasp something with her left hand. (Tr. 761.)

In April 2014, Dr. Saba noted that plaintiff was becoming more emotional and complained of anxiety attacks. The doctor advised her to check with her primary care physician regarding antianxiety medication. (Tr. 822.) Plaintiff completed her chemotherapy in May 2014. She was cancer-free and "doing great." She did still have some limitation of the range of motion of the left arm. (Tr. 816-817.)

Plaintiff was treated by Dr. David Carpenter, a neurologist, for her left arm problems from May 2013 to March 2014. (Tr. 516-527, 805.) Dr. Carpenter saw plaintiff a total of three times. Dr. Carpenter diagnosed plaintiff with acquired nerve palsy of the brachial plexus on the left at the first visit. Plaintiff was undergoing physical therapy and Dr. Carpenter ordered her to continue with that. He prescribed her Gabapentin. (Tr. 525-526.) In February 2014, plaintiff continued to have weakness and discomfort in the left arm. She had a decreased range of motion of the left shoulder. On exam, Dr. Carpenter noted:

> "Examining her upper extremities, she is now basically about 4+ at least at the left upper extremity interossei (tends to have some give way weakness), and there is now breakaway weakness in the left wrist extension, biceps, triceps, although I did have the impression that these is rather slight weakness on the left side compared to the right, when full effort is achieved. She does note that there is discomfort, suggestive of frozen shoulder. She continues to do range of motion exercise, although there doesn't appear to have been improvement in this.

Dr. Carpenter suggested a referral to an orthopedic surgeon for possible steroid injections in her shoulder. Plaintiff elected to try an increased dose of Gabapentin. He asked her to have an x-ray of the cervical spine. (Tr. 799.) The x-ray showed degenerative changes. He recommended that she continue with the increased dosage of Gabapentin. (Tr. 804-805.)

Ms. Mintert saw the surgeon, Dr. Crabtree, in March 2015. She was cancer-free.

However, she still had pain over her left chest wall where the resection was done, and she was taking OxyContin. Dr. Crabtree recommended that she see a pain management specialist because of her persistent pain. (Tr. 1152-1153.)

Plaintiff's primary care physician was Dr. Sean Flynn. The transcript contains office notes from Dr. Flynn for March 2013 through December 2013 (Tr. 701-777) and March 2015 through November 2015. (Tr. 1152-1161.) The records consist mostly of copies of other providers' records. An office note from July 2015 indicates that Dr. Flynn saw plaintiff to discuss her medications. Plaintiff had "side pain." She presented with depression and anxiety. She said she had bizarre dreams since starting Buspar, an anti-anxiety medication. She was also taking Paxil and Remeron for her depression and anxiety. She had chronic pain in her upper left chest and shortness of breath. She took Percocet, Gabapentin and Flexeril. Dr. Flynn recommended that she continue on her current medications. (Tr. 1154-1156.)

Plaintiff began receiving mental health treatment from Shelby County Community Services in December 2014. She received counseling and medication. Her medication was managed by Dr. Kavuri. (Tr. 872-984, 1061-1148.) In January 2015, Dr. Kavuri noted she was taking Paxil and Remeron that had been prescribed by Dr. Flynn. Her mood was depressed and anxious. He told her to increase her dosage of Paxil. (Tr. 945-946.) In March 2015, she reported that she had difficulty sleeping and was anxious. Dr. Kavuri advised her to stop Paxil. She was to continue taking Remeron. (Tr. 931.) In April 2015, Dr. Kavuri noted that her mood was depressed and anxious. She was to add Lexapro. (Tr. 933.) In June 2015, her mood was again depressed and anxious. She was to increase the dosage of Lexapro. (Tr. 947.)

**Analysis**

Turning first to plaintiff's last argument, the Court agrees that the ALJ failed to fully develop the record.

An ALJ has a duty to fully and fairly develop the record, and this duty is "enhanced" where the claimant is not represented by an attorney at the agency level. In such a case, "the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).

It is obvious that most of Dr. Flynn's office notes are not in the record. There are no records at all from his office for the period from January 2014 through February 2015. Further, the records that are in the administrative transcript (Tr. 701-777 and Tr. 1152-1161) are mostly copies of other providers' records, and not Dr. Flynn's own treatment notes.

The ALJ determined that plaintiff's mental impairments were not severe based, in part, on his perception that Ms. Mintert "sought absolutely no mental health treatment" until December 2014, when she began treatment at Shelby County Community Services. (Tr. 15.) However, other records indicate that Dr. Flynn was prescribing medication to treat plaintiff's depression and anxiety before then. In April 2014, Dr. Saba noted that plaintiff was becoming more emotional and complained of anxiety attacks, and advised her to check with her primary care physician regarding antianxiety medication. (Tr. 822.) In a disability report submitted in May 2014, plaintiff said that Dr. Sean Flynn had prescribed medication for anxiety and depression. (Tr. 256-257.) And, on the first visit with Dr. Kavuri in January 2015, he noted that plaintiff was already taking Paxil and Remeron that had been prescribed by Dr. Flynn. (Tr. 945-946.)

The ALJ also relied heavily on the opinions of a consultative examiner who saw plaintiff in

February 2014 and of two state agency consultants who reviewed the record in March and July 2014. (Tr. 15.) However, the examiner noted that plaintiff was taking "psychotropic medication prescribed by her oncologist (Tr. 779), which undermines the ALJ's conclusion that plaintiff received no mental health treatment until December 2014. And, as plaintiff argues, the value of the state agency reviewing consultants' opinions was considerably lessened by the fact that they did not review any of the records of her later mental health treatment. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, __ F.3d __, 2018 WL 914954, at *4 (7th Cir. Feb. 16, 2018).

Plaintiff raised the issue of Dr. Flynn's missing records in her brief. (*See*, Doc. 12. Ex. 1, p. 16.) The Commissioner ignores the issue in her brief. The omission of Dr. Flynn's records cannot be excused as harmless given the circumstances of this case.

Plaintiff is also correct that the ALJ misunderstood or ignored the records relating to her chemotherapy. The ALJ erroneously stated that plaintiff "finished all of her chemotherapy" in November 2013. (Tr. 20.) In fact, as was detailed in the above summary of the record, she did not complete chemotherapy until May 2014, and she experienced significant side effects during treatment.

While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases. The ALJ erroneously failed to consider whether plaintiff was at least entitled to a closed period of disability.

It is not necessary to analyze plaintiff's other points in detail.  Following the development of a full and fair record, the combined effects of all of Ms. Mintert's impairments, including her mental impairments, COPD, and left arm and shoulder impairments, must be considered. *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Candi Lynn Mintert's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: MARCH 2, 2018**

> s/ *J. Phil Gilbert*
> **J. PHIL GILBERT**
> **DISTRICT JUDGE**